Hang on a minute, Counselor. Let them all get settled in. It's your pleasure, Your Honor. Sure. Just let them—they're rearranging the furniture and doing other things there. All right. I think they're all in place. You're on, sir. Thank you. Good morning, Your Honors. My name is Kyle Shonekas, and together with Joel Evans, we represent the Plaintiff's Appellants. This matter comes before you on an appeal of a motion—of a granting of a motion to dismiss under Rule 12b. This was a lawsuit that we filed to upset a multibillion-dollar settlement obtained by fraud by the plaintiff, Andrew Schmitt. Mr. Schmitt contended that he was totally and completely disabled. In his words, he was an invalid. He was a shut-in. On his best days, he could stand upright for maybe two or three minutes. He had to be transported in a van that required a reclining wheelchair. Okay. Now let me tell you what I want you to tell me. All right, Judge. Because I assume that there were good lawyers here before this settlement—what's the term—was confected. Yes, ma'am. So tell me exactly what kind of expert opinion was put into this—was obtained by CalDive, and maybe by the other side, too, before this settlement was confected. I mean, what kinds of experts did you have that testified as to his disability? They had an expert in diving accidents, and he opined that he had what's called POTS, which is this posterior—essentially where he has difficulty when he stands up. A doctor? A doctor, yes, ma'am. It was an M.D. It was an M.D. He was an expert in diving accidents. Yes, ma'am. And he was deposed. He said that his injuries were readily treatable and that there would be no reason why he shouldn't be able to rehab. In fact— Now, that was whose expert? I'm sorry? Whose expert was it? CalDive's? CalDive's. Now, they had—the plaintiff had an expert, Dr. Weir, who said that he had a brain injury that rendered him, in this condition, that he would never stand up the rest of his life and that he would be an invalid forever. That was the doctor also? Yes, ma'am. Okay, so we had two doctors. Did we have anybody else that fell into the expert category? You know, Judge, I have to confess I didn't handle the underlying case. Well, that's not an answer today. Of all days, when you come in here and you start saying that there's fraud involved in this case, okay, then you have to be an expert on the record. It's no answer. I apologize, Judge. It never is an answer, but it sure isn't one in this context. Well, you know what the fraud was, Judge? When this gentleman says that I can't do any of these things, and he signs a release on December 12th, and he says in the release, and he swears to it, under oath, before a notary, who after being duly sworn said, whereas, Andrew Schmidt, while employed by CalDive, performed a dive from the lift boat Audrey off the coast of Louisiana, where he claims to have suffered decompression sickness, brain injury, injury to the autotomic nervous system, postural or static tectorial syndrome, and other injuries which have left him totally disabled. And the day before he signs that release, he goes to the Texas Motor Vehicle Commission, and he gets a driver's license, and that driver's license is unencumbered. He can drive and do anything. What I want to know is how much effort went into the confection of this settlement and how much expertise was brought to bear on it. Because what's at stake here is a head injury, and the head injuries are notoriously difficult to evaluate by the most accomplished doctors that you can get. Very difficult to evaluate. Now, you had two doctors here who put in evidence on the degree of his disability. In the district court before this settlement was confected, right? It was not tried. It was not put into evidence. No, I know, but I mean before depositions were taken. Yes, ma'am. And so this was not amateur week. No, it was not amateur week, and in fact, relative to that, they spent a considerable amount of money surveilling this gentleman. CalDive did. They surveilled him for over two years. Before the settlement? Yes, ma'am, before the settlement. And, in fact, they surveilled him going to and from his depositions as well, and there was video of the depositions, in which he would only get out of the vehicle to get in and out and then would be loaded in the back and would lay down the entirety of the time. And he appeared for the settlement conference wheeled in in a recumbent wheelchair, and when they recited the oral settlement on the record, he was laying back on his back with sunglasses on. And this gentleman, before he signs the release, we allege, and we have proof of, he goes to Texas and tours a house, a luxury, a four-bedroom house to rent. We interview the landlord. The landlord says, I've met with this gentleman several times, both before the lease as well as after the lease. So it was all your evidence that you claim suggests fraud post-settlement evidence? No, Judge, it's not. It was pre-settlement as well. The driver's license was December 4th. And when was the settlement? The settlement was December 12th. Okay, but back to the question. I'm sorry, go ahead. How many years from the incident until the eve of trial settlement elapsed? From the injury until eve of trial, approximately two and a half years. Two and a half years? Yes, sir. How many doctors examined him, yours and theirs? My recollection is that it was about three doctors examined him. And CalDive's doctors couldn't find any objective indication of brain injury. Is there anything in the record to say that those doctors relied on the statements or the physical verbal acts of the person that CalDive thought was malingering? Absolutely. There were statements that were made to Dr. Weir who confirmed the diagnosis that he had the brain injury on the basis that he was incapable of remaining in an upright position. And the fact that he wouldn't respond or didn't respond to the single treatment, he said, was further evidence. In fact, it was done immediately prior to the settlement conference. They did it at the side of a pool. And he measured his heart rate and said, yeah, this just confirms that this guy is incurable and he is permanently disabled. But you say CalDive, before the settlement, said that they didn't have any objective evidence of a brain injury? Correct. Before the settlement? Yes, ma'am. And you settled the lawsuit? Yes, ma'am. RIP? No, because, Judge, material misrepresentations were made. If this guy is permanently disabled, like he says that he is, and he affirms that on December 12th, how does he go to the Texas Motor Vehicle and get a driver's license? But your authority for invalidating for no more repose, your authority is Deepwater Horizon. Deepwater Horizon and the ports and the Fifth Circuit's Russell versus Puget Sound. Right. But Deepwater Horizon, I don't think you're going to quibble, the elements of a fraud and inducement are five or six, right? Correct. In your pleading, you don't go through element by element? We don't go element by element. And so when you say, well, look how egregious the misrepresentation was, that doesn't respond to the requirement that you have to make a showing, with particularity about reliance. How could your company, your client, have relied on the very person that they say they disbelieve and rely at the eve of trial from this wheelchair appearance? It just strains, one, you didn't plead it, and number two, it strains credulity. It doesn't fit with Russell even, because in Russell what they did, which would seem to me a prerequisite, would be you would take this video that's so damning, you'd go back to your doctor and say, having seen this, does it change your opinion? They did that in Russell. You don't have a single doctor that concluded he had a brain injury saying, what we've seen now means we relied on him to conclude he had one, his wheelchair position. If we had been permitted to do discovery, we could have done that, Judge, in terms of presenting the videotape. But it's your doctor. Well, yeah, we could have done it with our doctor, absolutely. Why didn't you? Well, because we got contacted about two weeks before the prescription date applied, and we rushed a file and we did our due diligence in terms of the extent of what this guy claimed and then what he was actually doing. I mean, everything he said he couldn't do, he in fact was doing and did before the settlement was signed. You had grave reservations all the while, from the day that guy got injured until the day you signed that settlement agreement, that he was what he said he was, which is tabula rasa or however you describe it. You had great reservations about that, and you thought you had reasons for those reservations. You went ahead and you had doctors and you had experts. You went ahead and signed the settlement agreement. No problem, because we'll just revise it when we get through. No, that's not the case, Judge. That's what it sounds like. What they're confronted with is that this gentleman, a doctor who says that he's in fact permanently disabled, that has this brain injury. They have surveilled him on and off for over two years, and they can find no evidence to suggest that, in fact, his representations were not true, that he was. Back up a step. Yes, sir. Your doctors. I mean, I'm still not clear. Are you saying your, let me say your, meaning CalDAV's doctors, relied 100% on what, what's his name, Mr. Smith said? Well, they were lying? No, sir, they're not. They're not. Well, recount for me what the CalDAV experts did in order to form their opinion that he was as he said he was. Well, what happened was they had requested and got. . . First of all, did they examine him? I'm sorry? Did they examine him? They did. On how many times? I don't. . . More than once? Yes, sir. In fact, the most pertinent one was they went and got a court order requiring him to submit to this therapist to undergo this therapy in order to attempt to cure this postural problem. He went one time, and he claimed through his lawyers that he was not going to endure that again, that he would kill himself before he did that again because it was so painful and that he couldn't tolerate it. Was there any other kind of, for want of a better word, diagnostic testing? I'm not. . . Yes, there were. There were CAT scans. Brain scans, CAT scans. Yes, sir, all of those things, and CalDAV's doctors believed that they were not indicative of brain injury. There you go. Wait a minute. They believed that it was not indicative? Correct. They did contest it. All right, so when they opined that to you, not you personally. . . Correct, not to me personally. I mean. . . And your client signed the settlement agreement. There you go. Correct, Judge, but they did so because they're confronted with an expert who's offered an opinion based upon the representations made by Schmidt about his disabilities that he can't do any number of things, and he does these things. The fact of the matter is, I mean, what he had supposedly was a brain injury, and the nature of that, brain injuries are not like when you have a broken arm or spinal injuries or your hip has been shattered or whatever. They're very, very difficult to predict the long-term effects of brain injuries, and doctors who look at brain injuries all say this guy is, you know, and then. . . I'm sorry, meaning he's. . . Meaning he's cooked. Right. I mean, he's going to be like this, a vegetable for the rest of his life, but brain injuries are not like bones, and they have very widely differing long-term outcomes, very different. And so your guys, you had experts, and they looked at this guy and they said, well, we don't think he has a brain injury, we don't think all these things, and you went ahead and settled. I mean, this was not amateur week. Your client was well represented, and there were competent people on your side. So what you're saying essentially then, Judge, if the plaintiff, in this case Schmidt, is successful in hiding. . . If he is successful and recovers, praise God, he recovers from whatever he had, and he recovers, then you're going to say, King's X, we get the money back. No. Yep. No. That's what you're saying. No, what I'm saying is that if he represents to us that I can't drive a car, I can't sit up, I can't do any of these things, and you know what happens? Before he signs the agreement, he does the very thing he says he can't do. We get that. I mean, we're not missing either the zeal or the comprehensiveness of what you're saying in terms of all this, but where we are is back at square one. I mean, I was on the BP panel, you know, where we had this get out of the deal. Yeah, I was on the panel . . . You were on the case that's on the Deepwater Horizon. Getting out of the deal, you know. We're like, wait a minute. We've got world-class lawyers on both sides. This stuff is, you know, traded back and forth and on and on and on, and so we're off into the deep sea of what happens. You know, we've got buyer's remorse, not minimizing the amount of money that's at stake, but, you know, this is just not the typical adhesion contract. So what we're trying to get, and you keep speeding past it, is your client has doctors, and I'm trying to understand, you've told me they didn't rely on what the guy said. They gave him diagnostic tests, et cetera, et cetera, et cetera, and what I thought you were going to say was that based on representations that he made, your doctor said, well, yeah, there's nothing showing to the contrary, but what you're saying is your doctors, in fact, doubted the status that he was saying, and I'm trying to understand when they put up that flag, what action, if any, was taken by your client, either on further testing, whatever, whatever, they just blew past it? No, sir, that's what I mentioned when they sent him to the therapist and did a session of therapy, which he refused to return to, which involved laying down, et cetera. But the point is, Judge, in terms of making a settlement, you keep saying, well, they had suspicions that perhaps he wasn't. They didn't have any suspicions. They didn't have any evidence of a brain injury, in their view. They didn't have suspicions. No, you said yourself, Judge, a minute ago, that these things are very elusive. They are. It's very hard to calibrate and say there's specifically a brain injury. That's right, and that undoubtedly factored into the decision to settle. That and the fact that for two and a half years, this guy laid down, did nothing, and refused to do anything because he could never stand up, because he was a shut-in and an invalid. That's why they did it, because they're confronted with an expert who says. . . Let me ask you something. Best evidence you have that that was all baloney and that he could have gone to the movies, when was the first time that there was some evidence that he could do something, besides the driver's license episode? That we've been able to uncover, Judge, thus far? Yeah. The driver's license episode is very significant, and then the day after the settlement, he goes to Texas, he tours around a . . . Yeah, but I'm talking about in the two and a half years that elapsed between when he got hurt and when the settlement was signed up, okay? How far back in that two and a half year period do you have evidence that he was out catting around? Given the fact that I'm on a 12B6 motion to dismiss and got the shutdown discovery on me, what I got was the driver's license information, and I found out that he bought a car and toured the parking lot. The very next day, before the release was executed, he toured a luxury home in Texas, standing upright and meeting with . . . So there's evidence that this was all baloney and that he was perfectly able to carry on dates from about the time of the settlement? No, ma'am. We only came by this in July after the settlement. What happened was there was a private investigator . . . No, but I mean the experience, the facts that you've got that this was confected, baloney, that it wasn't real. Don't predate the settlement by more than a few days. If you're asking when we learned of it or when it actually occurred . . . You had evidence that . . . In July, July of 2014. In the settlement . . . And the way . . . I'm sorry? What was the date? December 12, 2013. All right, I got it. And what happened was the private investigator, who had . . . You've got a red light, and I know we ask you a lot of questions. I'll save my time, Judge. Well, we've zoned you in. You've got some rebuttal time, and we want to get to this, so don't feel like you've got totally disenfranchised. But let's hear from the other side, and we'll have you back up and . . . Thank you. Give me kind of full throttle to cover this deal. All right. Good morning, Your Honors. Rick Stanley. I'm going to be taking about 15 minutes to address the issues relating to Mr. Schmidt, Mr. Edwards, and Mr. Walker. I'd like to begin by addressing a few of the questions the Court asked. You represent which party? I represent Mr. Edwards, but I'm speaking on behalf of everyone but BHG . . . Okay. . . . who will take the last few minutes about that particular issue. The restitution issue? The issue of whether . . . Contingency fee restitution? I'm going to discuss that. Oh, that's your covering? Right. What's the issue that's being . . . BHG's issue is, and which I can address now . . . I'm just curious. . . . is if there was a reversal, would their interpleader be reinstated? And, our position is, if there were a reversal, everyone would go back to status quo ante, and so that their motion would be reinstated. Okay. And, I just wanted to make that clear. Go ahead in the direction you were going, and then we'll . . . Sure. Well, first, the accident in this case took place in April 2010, which is three years and six months before the settlement was reached. And, to answer your question, Judge King, there is absolutely no evidence that Mr. Schmidt was doing anything during that three years and six months, inconsistent with any of the claims or allegations in this case. So, that's a point that's very important. The second point, date-wise, is the settlement was reached before the magistrate judge. This was a settlement supervised by the court on October 15, 2013. That was one week before the trial. And, Mr. Shonekas is referring to a December date. The December date is when the release was signed. But, the settlement was reached October 15, 2013. It was put on the record, and that's when the trial was continued, pending the execution of the release, which followed some seven weeks after the case was, in fact, settled. The release is important because, your honors asked, well, was he examined by doctors? On page two of the release, it lists every medical provider that he saw. And, there are actually, by my count, 28 physicians who saw him throughout this case. He has been diagnosed by these physicians with decompression sickness and the Potts Syndrome. I can't really pronounce what it was, but, which is medically observable by a tilt test. They put you on a table, they tilt you, your heart rate changes, and the doctors said, well, you can't fake that. Now, one of their doctors actually said they did think he could fake it. And, in fact, that was testimony in the record in the underlying case, that they never did believe Mr. Schmidt. In fact, their guys never did believe him. Never believed him, that's right. Never believed him. And, in fact, they filed a counterclaim in the underlying case to recover back their maintenance and cure from Mr. Schmidt. So, this is not, we believed him, we thought he was telling us the truth from day one. They absolutely, this was full on discovery, 28 physicians. Here's my concern, I mean, just because your time's ticking away. You know, my background, you've got, in the criminal area, you've got a contract you're going to sign. And things get really pressured before the drop dead date. And it's inconceivable to me that the prosecutor could have what's known as Brady, exculpatory evidence. Guy didn't really do it. But we're not going to give that to them until we get this guy pled guilty. So, why is that not a fair analogy? The district court relied on the strange decision. But that's a mistake of fact. And that will get you rescission if both parties, if the doctors were just wrong. The x-ray shows something else. But this is, their claim here is intentional fraud. More analogous to, you've got Brady exculpatory evidence and you're just not going to tell them until you can flaunt it. And so the day after the settlement's signed, or two months later in December of 2013, he's jogging two miles. He's got the personal trainer. He signs for a license with no physical restriction. All the parade of horribles you heard him say. There's something deeply offensive if, in fact, so then I get to Deepwater Horizon. And it's mandatory. You get an evidentiary hearing. But, and then they cite, without a doubt, approvingly, the Ninth Circuit Russell decision that had post-settlement video evidence. So why aren't we exactly in the mandatory they get an evidentiary hearing? We can all be reassured. I'm sure your view is, our client isn't, this wasn't a massive fraud. We need to vindicate him. We could survive that hearing. Well, we've got, you said a lot, Judge. Yeah, I did. Yeah, I know. Unpack that. Let me see if I can unpack it. It's just my worry. No one wants to allow fraud here. It's a legitimate worry. But one of the problems, just let me start there procedurally, is in Deepwater Horizon you were dealing with motions. And so, same with Russell. You're dealing with a motion to either not, to set aside the settlement agreement or under 60D. This is not a motion. This is a complaint. Well, that's very unclear in this record. Let's assume the 60D motion complaint, when you read the papers, it's really unclear. Well, I think what CalDive wants is a full-on trial. They don't want an evidentiary hearing. Okay. Well, I look forward to hearing his response to that. They never asked. Let's assume he just wants a hearing. Right. And so we're applying the Deepwater Horizon. Then I would go to this point. I think if you look at Russell and you look at Deepwater Horizon, there is a distinction to be made. The distinction is that in those cases the very diagnosis of an injury was called into question by facts that were pre-settlement facts, pre-settlement facts that came into being, at least in Deepwater Horizon. Right. In Deepwater Horizon they were. The colleagues on the boat said he's jumping around. But Russell is the worrisome case. Russell's different, but Russell also goes to the diagnosis. Russell also goes to the diagnosis. At best what CalDive has here is that this guy had a very bad prognosis. We thought, as we foreshadowed what was going to happen in the future, we thought he would never drive, he would never run, he would never recover. As it turns out, he did. And, by the way, the jogging and all that, I think that that all occurred seven months after the settlement. The only thing prior to the execution of this release document was getting the driver's license. But he did say unrestricted driving. He did say unrestricted. That's hard to understand. At least that's the allegation. Okay, now, related to that, what really drove this settlement, as I understand it, is the life care plan, where it says he needs 24 hours a day, he'll need a new wheelchair every five years. My question factually is in the record, is there any evidence that his own statement and description of condition went into the formation of that life care plan, representations that he made that he was an invalid? The answer to that is I don't know that to be in the record. I know that it is an allegation. Okay. So, in this context, we have to accept it. But if you read the release document that CalDive prepared, never do they say, you're representing to us in this release document that these representations are true. And without these representations, why wouldn't we say? I was asking you, and maybe I interrupted my own question, which I do, but for you to win, do we distinguish or do we disagree with Russell, which had post-settlement video observations of a seaman doing things that he couldn't have? First of all, I don't think it's the law of the circuit. I think Deepwater Horizon cracked the door, but I don't think they went as far as Russell. I think under Deepwater Horizon, you've got to basically allege no injury or de minimis injury before you get the evidentiary hearing. And Russell didn't seem to go quite as far. But I think you can distinguish Russell. I don't think you have to say, well, that's not the law of our circuit, because of the diagnosis versus prognosis. The evidence that came forward in Russell was that the man was not injured at all, that he had no injury. And when it was presented to the experts, they looked at it and said exactly as you said. We would not. Our opinions are no good based on what we're seeing in this motion picture film. So that is a completely different set of circumstances than you have here, where you have a better than expected recovery or prognosis. So most of the intentional fraud cases, even like Russell, you're suggesting, correct me if I'm wrong, that they've got some nondisclosed facts that the doctors never got, or you have witnesses recanted, you don't tell them about that. It ties back historically to a pre-settlement agreement? Yes, and that calls into question whether there was any injury at all. Am I right that in Russell, the evidence submitted to get the fraud and inducement included a doctor saying, if I'd seen this, I wouldn't have made that diagnosis? I think there's more than one doctor. And that doesn't exist here? That does not exist in this. At least there's no allegation in the complaint to that effect. So is this a failure? The district court below, did it find lack of particularity as to the elements of fraud? Yes, it did. That was one of its findings, that the allegations did not satisfy the test under 9B. And the district court relied on Judge Barbier's district court opinion, which was prior to Judge King's appellate court opinion, so he was looking and saying, I don't even have to have a hearing on this. This is obvious that there's a settlement agreement and everyone's bound by it. But I think the Fifth Circuit's opinion still doesn't get them there, that in order to come within this narrow exception, and this settlement says it's full, final, and complete, it's a 15-page release. One more question. What's the limiting principle then, so that where there is fraud, there's an ample opportunity for it to be heard? There are two limiting principles. One is Rule 60. You've got one year under 60B.3 to come back into court and set aside the settlement and set aside the judgment. So you've got a time limitation. The substantive limitation is Deepwater Horizon. And, frankly, I think, Russell, that if you're going to have evidence. I sort of meant make the other side's case. Our limiting principle, you may win here, but it doesn't mean people can walk to the bank with their $12 million and think, Boy, I pulled that off. When the allegation is, even with subsequently discovered evidence, when the allegation is that the injury did not occur or was de minimis, then I think you've got a basis to go back to court under 60B.3. When the allegation is that you thought you were going to do worse than you seem to be doing, whether it's by the grace of God or whether because you're managing your symptoms better or whether you just got lucky and you're not as bad off as everybody else with POTS, whatever the reason, that's not a basis to go back and retrade the settlement. That's my position. I can talk a little bit about the lawyer issue. Obviously, if it's affirmed for Mr. Schmidt, the lawyer issue goes away. If you reverse this to Mr. Schmidt, we still have the lawyer issue as to whether the lawyers should have been brought back into this case. Lawyers of the world might have preferred you to have spent a lot more time on that. Is it a simplistic way for me to think the district court relied on Louisiana law but you wouldn't rely if federal law is in conflict? Is that a fair statement? That is a fair statement. I think it was fair to rely on Louisiana law for a couple of reasons. One, remember this is an independent action. The lawyers were not parties until they were sued in this complaint, so you have to sue them under some theory, and they were sued under restitution and unjust enrichment, and I think Louisiana law fairly applies. But even easier than that, the restatement, which they rely on so heavily, when you dig into the cases in the restatement where the lawyers are called to give back the money they got in their fee, all of those are direct appeal cases. Not a single one is an independent subsequent action. These lawyers were in good faith. That's alleged. This is contingency. You may know these cases off the top of your head. I wouldn't. Mohammed v. Care, 8th Circuit. I don't know them off the top of my head, but I will say I think the answer is, yeah, they were contingency fees, but what happened is the case went up on appeal and got reversed. So you're still in the same linear appeal. Not a single one of those cases involved a final judgment and a settlement and then a subsequent independent action to take back the fee. So I don't think the restatement addresses this issue. Do you know a case that describes what you just said as an exception to the larger rule? No. But every case we looked at under the restatement is a direct appeal with the exception of one, which is a workers' comp case where the award got adjusted on review. But we saw none that were independent separate actions. And finally, with respect to the amendment, the failure to allow an amendment, I think this is very easily dealt with. The Cal Dive has stated again and again that, well, we didn't assert any new evidence in our amendment. We didn't assert any new facts. We only asserted that the district court made a manifest error of fact or law. Well, that's simply a motion for reconsideration. If you accept their word that there were no new facts in the amended complaint, then all we have to focus on is what the district court did in the beginning, which I've already addressed. So I don't think there's anything in the amended complaint that changes the complexion of the case. I will turn the podium over to co-counsel. Thank you, Mr. Stanley. Edder. Good afternoon, Your Honors. Lindsay Matter on behalf of BHG and Berkshire. Your Honors, first I want to make note that BHG and Berkshire take no position on the merits of plaintiff's appeal or on the arguments of appellees. What we'd like this court to keep in mind through the decision process is if for some reason you do decide to grant, to reinstate the plaintiff's complaint in this case, that you also reinstate the interpleader that was filed as well. Whenever the district court dismissed the cross-claim and counter-claim with the interpleader, where we requested that the funds being paid be put into the court registry given the disputed claims. When that was dismissed, it was not on the merits. There were no merits heard. It was only dismissed because it became a moot issue once the complaint was dismissed. So the only thing that we're asking of this court today is that should you reinstate the plaintiff's complaint, that you also at the same time ensure that the counter-claim and the cross-claim filed by BHG and Berkshire also be reinstated. Thank you. Thank you. Mr. Jones, back to you. I'd like to briefly address the, I call it the lawyer claim for restitution and unjust enrichment. My opponent, Mr. Stanley, has suggested that we apply state law in this instance, and I suggest to you that that's not appropriate, that federal law should apply, and where there's an absence of federal law on the particular issue, you go to the restatement. And if you look at Maranstro versus Canadian, it's a Fifth Circuit 1992 case that says essentially that. In addition to that, Judge Barbier addressed this issue in the Deepwater Horizon case on two occasions. Both times he applied the restatement and said what the restatement says, which is a lawyer is a real party in interest on a contingency fee case. He's not an assignee. And for that reason, in Thon, which was one of the Deepwater Horizon cases, and in Berks, which was another one that occurred after that, in both instances, the lawyers were not involved in the fraud. Nonetheless, the court ordered restitution because they are real parties in interest. And, again, the restatement states, a bona fide payee from a judgment creditor might, of course, be a lawyer as well as a bank. However, a lawyer who receives a share of the judgment, pursuant to a contingency fee arrangement, does take the money as a bona fide payee. Notwithstanding, the lawyer takes the money in such case in good faith in between the client. This makes the lawyer not the client's creditor, but an assignee pro tonto of the client's judgment. For that reason, Barbier ordered return, and it's being done on a regular basis in Deepwater Horizon in connection with those fraud claims. He drew attention to the fact that you filed a complaint. It wasn't a 60B motion? It was a motion that was done in connection with that case, Judge. But under 60B, you can do it both by motion and independent action is what the rule did, which is why we filed an independent action. Which did you do? We filed an independent action, and then it was transferred back to Judge Hike. I hearken back to Russell versus Puget Sound, kind of apropos to the questions I got from Judge King in terms of skepticism about the extent of the injury. And what did they say in Puget Sound? On August 24th, while working as a seaman aboard a tug owned by defendants, plaintiff Russell was struck on the left arm by a PV or a wooden lever. Russell sued under the Jones Act, claiming his injured arm disabled him as a seaman. At his deposition, Russell stated he could not straighten his left arm and had difficulty lifting objects. So we're talking here about the severity of the injury, whether he could actually do these things. And what happened was, after the fact, the private investigators who were filming this gentleman didn't get word of the settlement. And they filmed him and got him after the settlement, within the following week, the private investigators who had been hired by defendants to observe Russell and who were notified of the settlement noted substantial increase in the use of Russell's left arm. Motion pictures were taken, lifting various sorts of building materials. The district court, without holding a hearing, denied the motion and ended judgment for the plaintiff. The denial, without a hearing, was an abuse of discretion. But you know what I'm going to ask. I mean, in Russell, the reliance interest element of fraud and inducement was met because their own doctors said, had we known this? That may not be how it was suggested to me to distinguish, which I haven't processed fully, but to me that was an important point of distinction. What they said was the defendant's medical experts and vocational said they would revise their opinions. That sounds like some allegation of reliance. Right, and what we allege in the complaint, in the original complaint, was a plaintiff entered into and funded the settlement agreement with Schmidt as a result of his material, fraudulent representations regarding his injury, condition, and alleged disability. In other words, we can't in a vacuum just accept the opinions of our own expert, but we've got to examine the realities. What are the chances that we're going to get hit? Because this guy has not gotten up for two and a half years. Now, you had asked the question as well, Judge, in terms of temporally, what other proof did we have that showed prior to the execution of the release? I neglected to mention the notary. He appeared before a notary in Texas on December 12, 2013, and the testimony from the notary will be he presented himself normally. There was no wheelchair. No one helped him in. When was the settlement? December 12 was the date that the settlement was executed before a notary by Schmidt. The settlement conference was October 15. So what you're saying is the evidence you have is all right about the time of the settlement. Yes. With the lawsuit, the injury, somebody said three years? I have the date. Three years and six months before the settlement. He was injured on 4-7-10, April 10. What did he say, 26 doctors? No, he said 26 doctors, and some of those were ambulance attendants. It's a litany of everybody that provided any sort of medical care, not necessarily doctors that examined him. But there were a lot of doctors involved in this deal. Yes, ma'am. There were a lot of doctors, and a lot of doctors were told, I can't get up. It kills me to sit up. I can't do this. Doctors, I mean, they're not amateurs. You said brain injuries are very hard to detect, right? Well, it's not that they're hard to detect. The nature of brain injuries is that the prognosis is more uncertain. But just like in Russell, Judge, to a large extent, both the doctors and opposing experts have to accept or rely upon the history given to them by the patient. And this gentleman represented that he couldn't do anything. And we allege that, in fact, in connection with that settlement, we relied upon those representations. And this is on a motion to dismiss under 12B. And I think we should have gotten that opportunity to amend. In fact, we were supposed to have a hearing, and the week before the hearing Judge Hike issued the dismissal with prejudice without an opportunity to amend. Thank you very much. Thank you, counsel, for both sides for your briefing and argument. This completes the orally argued cases for the day.